Cameron HENDERSON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 11A01–9407–CR–233.

Court of Appeals of Indiana,
First District.

Feb. 17, 1995.

Rehearing Denied April 19, 1995.

Transfer Denied July 3, 1995.

Eric M. Abel, Brames, Abel & Oldham, Terre Haute, for appellant.

Pamela Carter, Atty. Gen., Joseph F. Pieters, Deputy Atty. Gen., Indianapolis, for appellee.

BAKER, Judge.

Appellant-defendant Cameron Henderson challenges his three convictions for Check Deception,[1] all Class A misdemeanors, raising several issues which we restate as whether: 1) the special judge was properly appointed, 2) the trial court correctly denied his separation order, 3) the trial court properly denied his motion for discharge pursuant to Indiana Crim.Rule 4(C), and 4) the evidence was sufficient to sustain his convictions.

### FACTS

Henderson is the sole shareholder and president of the Cameron Henderson Oil Company. He is also the president of Star Service and Petroleum Company located in Texas. Harold Sneath operates, Sneath Oil Company, which sells fuel oil in Clay County, Indiana. Henderson owns service stations located in Indiana for which he purchased diesel fuel and gasoline from Sneath. Henderson bought the gas on credit and was to repay Sneath for it later.

In June 1989 Sneath deposited four Star Service checks made payable to Sneath Oil Company. However, the bank returned the checks to Sneath because payment had been stopped on them. Sneath contacted Henderson about the deficiencies and on July 8, 1989, Henderson executed and signed a promissory note promising to pay Sneath the $79,561.17 he owed him in monthly installments of $10,000 to begin on July 15, 1989.

On July 20, 1989, Sneath received a check from Cameron Henderson Oil Company dated July 14, 1989, and payable to him in the amount of $10,000. Sneath deposited the check. However, on August 2, 1989, the bank returned the check to Sneath because of insufficient funds in the company's account to cover the amount of the check.

Subsequently, Sneath received two checks from Star Petroleum, one dated September 14, 1989, and the other dated September 20, 1989, both in the amount of $2,000. After Sneath deposited the checks, the bank returned them both unpaid. The bank refused to pay the first because of insufficient funds and the latter because the Star Petroleum account had been closed. Sneath made several phone calls to Star Petroleum regarding the returned checks, but was unable to speak directly to Henderson.

On November 21, 1989, the State charged Henderson with one count of Theft[2], a Class D felony, under cause number SCR–89–470 for the July 14 check. On the same day he was also charged with two additional counts of theft, Class D felonies, under cause number SCR–89–471 for the September 14 and 20 checks. On March 2, 1990, SCR–89–470 was amended to include one count of check deception, a Class A misdemeanor, and SCR–89–471 was amended to include two counts of check deception, both Class A misdemeanors.

Ultimately, a jury convicted Henderson of three counts of check deception, all Class A misdemeanors, and acquitted him on the theft charges.

### DISCUSSION AND DECISION

#### I. Appointment of Special Judge

Henderson claims that Judge Nardi was improperly appointed to serve as special judge in this case and, thus, had no jurisdiction to hear the case and enter convictions. Specifically, he asserts that pursuant to Ind.Trial Rule 79(7) Judge Stelle did not

---

1. IND.CODE § 35–43–5–5(a).

2. IND.CODE § 35–43–4–2(a).

have the authority to appoint a new special judge.

T.R. 79(7) provides:

> In the event a special judge who has assumed jurisdiction of a cause ceases to act as special judge, other than by reason of the filing of a motion for change of judge, or a judge appointed by the Supreme Court does not qualify within twenty (20) days of appointment, the current regular judge of the court may assume jurisdiction if such regular judge was not the person from whom the initial change of judge was taken and such regular judge is otherwise qualified to serve. On those instances where the regular judge does not assume jurisdiction under this provision, the cause shall be certified to the Supreme Court for the appointment of another special judge.

Here, Judge Vaughn, who had been appointed by the Supreme Court and timely qualified, ceased to act as special judge because of his impending retirement and not by reason of a motion for change of judge. Further, Judge Stelle had previously recused himself from the case and thus was not qualified to reassume jurisdiction. As a result, T.R. 79(7) directed Judge Vaughn to certify the cause to the Supreme Court for appointment of a new special judge. Judge Stelle's appointment of Judge Nardi was contrary to T.R. 79(7).

 Nevertheless, we find that Henderson acquiesced to Judge Nardi's jurisdiction. An objection to the authority of a special judge must be made at trial. *Floyd v. State* (1994), Ind., 650 N.E.2d 28, 32. When no objection has been timely raised in the proceeding, any objection to the special judge's authority is deemed waived. *Id.* At no point in the proceeding did Henderson object to the procedure employed to appoint the new special judge. Moreover, the record reveals that Henderson expressly agreed to the appointment of Judge Nardi. R. at 5. Accordingly, Henderson has waived any objection to Judge Nardi's authority to hear the case.

## II. Joinder

Henderson asserts that the trial court erred in denying his motion to sever the counts for theft and check deception charged in the information under cause number SCR–89–470 from those counts charged in the information for cause number SCR–89–471. He claims that pursuant to IND.CODE § 35–34–1–9(a)(1) he was entitled to severance because the court joined these counts solely on the basis that they were of the same or similar character.

First, we note that neither Henderson nor the State recognize that IND.CODE § 35–34–1–10(b) is the applicable statutory provision regarding joinder of offenses that are charged in two or more indictments or informations. I.C. § 35–34–1–10(b) provides:

> When a defendant has been charged with two (2) or more offenses in two (2) or more indictments or informations and the offenses could have been joined in the same indictment or information under section (9)(a)(2) of this chapter, the court, upon motion of the defendant or the prosecuting attorney, or on its own motion, shall join for trial all of such indictments or informations unless the court, in the interests of justice, orders that one (1) or more of such offenses shall be tried separately. Such motion shall be made before commencement of trial on either of the offenses charged.

 Thus, in order to determine whether the court was required to grant the State's motion for joinder, we must decide first if the two offenses could have been joined in the same information under I.C. § 35–34–1–9(a)(2). I.C. § 35–34–1–9(a)(2) permits joinder if the offenses are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan. Factors that a court examines in deciding whether the crimes were a single scheme or plan include whether they are connected by a distinctive nature, have a common modus operandi, and a common motive. *See Baird v. State* (1992), Ind., 604 N.E.2d 1170, 1184–85, *cert. denied.* —— U.S. ——, 114 S.Ct. 255, 126 L.Ed.2d 208 (1993).

■ The record reveals that Henderson's scheme was to purchase gas from Sneath using corporate checks drawn on accounts that did not have sufficient funds to cover the amount of the checks. Henderson issued the three checks to Sneath within a relatively short time period. The first check which is the basis for the charges in cause number SCR–89–470 was issued on July 14, 1989. The two checks in cause number SCR–89–471 were issued on September 14, 1989, and September 20, 1989. Hence, Henderson had a common scheme to defraud Snead and the theft and check deception offenses could have been joined in one information pursuant to I.C. § 35–34–1–9(a)(2).

Next, we examine whether the trial court abused its discretion in denying severance of the offenses pursuant to the factors listed in IND.CODE § 35–34–1–11(a): the number of offenses charged, the complexity of the evidence to be offered, and whether the fact-finder will be able to distinguish the evidence and apply the law intelligently as to each offense. *Baird*, 604 N.E.2d at 1185. Here, Henderson was charged with two offenses, theft and check deception, for each insufficient check. Thus, only six offenses were joined and virtually the only variables in each of the charged crimes was the number of each check and the date on which it was issued. All the checks were for large amounts of money and were written from corporate accounts of which Henderson was the president of the corporation. There is nothing exceptionally confusing or complex about the evidence. The jury's acquittal of Henderson on the theft charges supports that the jury was able to distinguish the evidence for each offense. *See id.* We find no abuse in the trial court's denial of severance.

### III. *Crim. Rule 4(C)*

■ Henderson argues that the trial court erred when it failed to grant his motion for discharge. The record reveals that the State arrested Henderson on February 28, 1990. His trial did not begin until February 8, 1994, almost four years after he was arrested. Henderson asserts that because he was not brought to trial within one year after he was arrested, and he was not responsible for the delay, he should have been discharged pursuant to Ind.Crim.Rule 4(C).

> Crim.R. 4(C) provides, in relevant part: Defendant discharged. No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar …

When the defendant's acts cause delay, the time limitations specified in Crim.R. 4(C) are extended by the period of the delay. *Terry v. State* (1992), Ind.App., 602 N.E.2d 535, 542. Therefore, according to the rule, Henderson should have been discharged when he was not brought to trial by February 28, 1991, unless the delay was chargeable to him. This case has a long and complicated chronology of motions, hearings, recusals, and orders. Some of the delays were chargeable to Henderson, and some were not. Our task is to determine the number of days chargeable to Henderson.

The following chart shows the numerous delays relevant to our decision and the days chargeable to Henderson and the State:

| Description | Date | Henderson | State |
|---|---|---|---|
| Henderson arrested, trial set for 5/14/90 | 2/28/90 | | |
| | | | 72 days |
| Henderson's Continuance | 5/11/90 | | |
| Trial reset for 11/19/90 | | 187 days | |
| Henderson's Continuance and Motion to Sever | 11/14/90 | | |

| Description | Date | Henderson | State |
|---|---|---|---|
| Court grants both, vacates trial date, defers setting new date until State elects cause # to be tried first | 11/16/90 | | |
| Trial reset for 7/8/91 | 3/18/91 | | |
| Henderson's Motion to Dismiss | 5/8/91 | | |
| Court sets hearing on motion to dismiss for 7/2/91 | 5/23/91 | 471 days | |
| Trial Judge Recusal | 7/2/91 | | |
| Special Judge appointed | 11/18/91 | | |
| Hearing on Motion to Dismiss reset for 1/30/92 | 12/16/91 | | |
| Henderson fails to appear at Hearing | 1/30/92 | | |
| Hearing on Motion to Dismiss | 2/28/92 | | |
| Trial reset for 7/9/92 | 3/25/92 | | 98 days |
| Court grants Joint Motion for Continuance, vacates trial date | 6/5/92 | | |
| Trial reset for 10/13/92 | 6/11/92 | | |
| Henderson's Continuance | 9/25/92 | | |
| Trial reset for 1/5/93 | 10/13/92 | | |
| Special Judge Recusal | 12/16/92 | | |
| Special Judge appointed, trial reset for 9/22/93 | 4/22/93 | 559 days | |
| Henderson's Motion for Discharge | 9/1/93 | | |
| Court sets hearing on motion for 9/23/93 | 9/2/93 | | |
| Court's Own Motion to reset hearing for 10/19/93 | 9/23/93 | | |
| Hearing | 10/19/93 | | |
| Court denies Discharge and resets trial for 2/8/94 | 12/16/93 | | |
| | | | 54 days |
| Trial | 2/8/94 | | |

Initially, we note that the one year time period under Crim.R. 4(C) began to run on the day Henderson was arrested, February 28, 1990. *Nance v. State* (1994), Ind. App., 630 N.E.2d 218, 220. However, on March 11, 1990, Henderson filed his first motion for continuance. The court granted the motion and reset the trial date for November 19, 1990. The delay attributable to the defendant runs from the time the motion is filed through the date upon which the new trial is rescheduled. *See Terry*, 602 N.E.2d at 544. Thus, the entire 187 day period from March 11, 1990, to November 14, 1990, when he filed another motion for continuance, was chargeable to Henderson.

On November 14, 1990, Henderson filed his second motion for continuance as well as a motion for severance. Henderson was charged with the delay from the date he filed the motions, November 14, 1990, until July 8, 1991, the date the trial was reset to commence. However, on March 8, 1991, Henderson filed a motion to dismiss. Normally, Henderson would be charged with any delay resulting from his motion to dismiss. However, in this case, he filed the motion during the time period in which he was already being charged for the delay due to his motion for continuance. We do not charge him twice for those days of delay that overlap. Rather, he is charged with delay from his motion for continuance through July 8, 1991. Then, any delay from the motion to dismiss occurring after July 8, 1991, will be charged to Henderson.

The court set a hearing on Henderson's motion to dismiss for July 2, 1991, six days before his trial was to commence. However, on that day Judge Stelle recused himself. The special judge, Judge Vaughn, was not appointed until November 18, 1991. Thereafter, the special judge rescheduled the hearing for January 30, 1992. Henderson failed to appear for the hearing. Thus, the hearing date was reset again and finally held on February 28, 1992. Henderson is charged with the delay through February 28, 1992, because the court did not rule on his motion to dismiss until then. In sum, the entire period of time from the day he filed his motion for continuance until February 28, 1992, the day the hearing on his motion to dismiss was held, is chargeable to Henderson, for a total of 471 days.

However, we observe that this entire 471 day period of delay is not entirely attributable to Henderson's actions in that a portion of the delay was due to the judge's recusal. The 139–day period between the recusal and the appointment of the special judge obviously was not a delay caused by Henderson. Our task is to determine the effect of this delay upon the time limitations of Crim.R. 4(C). For guidance we look to *Morrison v. State* (1990), Ind., 555 N.E.2d 458.

In *Morrison*, our supreme court dealt with a situation in which the scheduled trial date fell within the interim where no judge was available to hear the case. *Id.* at 462. The court referred to *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260, 1265, *cert. denied*, 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105 which recognized an exception to Crim.R. 4(B) for court congestion where any exigent circumstance warrants a reasonable delay beyond the limitation of Crim.R. 4(B). *Id.* The *Morrison* court then stated that:

> The unavailability of a qualified trial judge can be a serious systemic delay, but one which the State has little means of addressing. Assuming, arguendo, that a delay due to the unavailability of a judge who can properly hear the case qualifies as court congestion which tolls the running of the time period, then delay D would extend the ultimate deadline to July 19.

*Id. Morrison* suggests that delay due to the unavailability of a judge who can properly hear a case is an exigent circumstance which qualifies as court congestion and tolls the running of the Crim.R. 4(C) time period. Thus, in the present case, Judge Stelle's recusal, six days before trial, constituted an exigent circumstance and the 139–day delay between the recusal and the appointment of the special judge tolled the running of the Crim.R. 4(C) time period.

Tolling the time period of Crim.R. 4(C) extends the ultimate deadline by which the defendant must be tried. *Id.* Similarly,

any delays caused by the defendant extend the time in which he must be brought to trial. Thus, although tolling occurs as a result of an exigent circumstance not occasioned by the fault of the defendant, tolling extends the time limitation just as any delay chargeable to the defendant would. As a result, we do not draw a distinction between the days chargeable to Henderson due to his own delay and the days that toll the time period because of the judge's recusal. The tolling period is included within the days chargeable to Henderson.

■ Finally, we get to the delay caused by the joint motion for continuance. This motion was filed by the State and agreed to by Henderson and thus was chargeable to Henderson. *See Ferguson v. State* (1992), 594 N.E.2d 790, 792, (defendant is held responsible for any delay caused by his actions including seeking or acquiescing in any continuance). The entire period from the date the motion was filed, June 5, 1992, until the date the trial was reset, October 13, 1992, was chargeable to Henderson.

■ On September 25, 1992, Henderson requested another continuance of the trial date. On October 13, 1992, the court reset the trial date for January 5, 1993. This whole period of time, through January 5, 1993, was chargeable to Henderson.

■ On December 16, 1993, the special judge recused himself because he was retiring. A new special judge, Judge Nardi, was appointed on April 22, 1993. He reset the trial date for September 22, 1993. The delay caused by Judge Vaughn's recusal twenty days before trial constituted an exigent circumstance and tolled the running of the Crim.R. 4(C) time limitation. As we discussed previously, tolling extends the Crim.R. 4(C) time period and is therefore treated as if it were chargeable to Henderson. For this reason, the days chargeable to Henderson continued to run through the new trial date of September 22, 1993.

■ On September 1, 1993, Henderson filed a motion for discharge pursuant to Crim.R. 4(C). At this time, Henderson had 1,116 days (over 3 years) of delay chargeable

to him which extended the time in which he had to be brought to trial. As we noted at the beginning of this discussion, the one-year time period under Crim.R. 4(C) was to expire on February 28, 1991. The delay of over three years attributable to Henderson extended that deadline to approximately February 28, 1994. Thus, the trial date of September 22, 1993, was well within the time period allotted to the State. Because Henderson's motion for discharge was untimely in that no violation of Crim.R. 4(C) had yet occurred, the trial court did not err in refusing to grant it.

Furthermore, the entire period from the date he filed the motion for discharge on September 1, 1993, until the court held a hearing and ruled on the motion on December 16, 1993, was chargeable to Henderson and further extended the date upon which he had to be tried. *See Terry*, 602 N.E.2d at 543.

As a final observation, we note that at first glance the four-year lapse before Henderson received a trial seems atrocious. After reviewing the record and discovering that Henderson was responsible for over two and one-half years of delay, not including the tolling for the special judges, the delay is not unreasonable. It is also noteworthy that several of Henderson's delays were made within two to three weeks of trial dates. In fact, during the first year from his arrest, Henderson had the opportunity to proceed to trial twice, but both times he sought continuances within a week of trial. Henderson chose to postpone his trial several times and he cannot now benefit from his own delays.

## IV. Sufficiency of the Evidence

Henderson contends that the evidence was insufficient to sustain his convictions for check deception. Specifically, he claims that the requirements of IND.CODE § 35–43–5–5 were not satisfied in that 1) the signatures on the checks were illegible and there was no evidence in the record to prove that he was the maker of the checks and 2) he did not receive notice of the nonpayment of the checks.

When reviewing a sufficiency challenge, we do not reweigh the evidence or judge the credibility of witnesses. *Green v. State* (1992), Ind., 587 N.E.2d 1314, 1315. Instead, we consider the evidence most favorable to the verdict and any reasonable inferences to be drawn therefrom. *Id.* If an inference reasonably tending to support the verdict may be drawn from the evidence, the conviction will not be set aside. *Id.*

I.C. § 35–43–5–5(a) provides:

A person who knowingly or intentionally issues or delivers a check, a draft, or an order on a credit institution for the payment of or to acquire money or other property, knowing that it will not be paid or honored by the credit institution upon presentment in the usual course of business, commits check deception, a Class A misdemeanor.

The State had the burden to prove that Henderson was the maker, issuer, or deliver of each of the checks. *See Caudle v. State* (1980), Ind.App., 404 N.E.2d 57, 58. We find that the evidence was sufficient to prove that Henderson was the maker of the check.

Each of the signatures on the three checks, although illegible, were nearly identical in form to the signature that Sneath witnessed Henderson place on the July 8, 1989, promissory note. Further, Henderson is the president of both of the corporations from which the checks were written. Thus, he had the power and the opportunity to issue the corporate checks. The evidence of record was sufficient for the jury to reasonably conclude that Henderson was the maker of the checks.

Next, Henderson alleges that the evidence was insufficient to prove that he received notice that the checks had not been paid and, thus, he could not avail himself of the defense provided by I.C. § 35–43–5–5(e) which reads as follows:

It is a defense under subsection (a) if a person who:

(1) has an account with a credit institution but does not have sufficient funds in that account; and

(2) issues or delivers a check, draft, or order for payment on that credit institution;

pays the payee or holder the amount due, together with protest fees and any service fee or charge, which may not exceed the greater of fifteen dollars ($15) or five percent (5%) (but not more than two hundred fifty dollars ($250) of the amount due, that may be charged by the payee or holder, within ten (10) days after the date of mailing by the payee or holder of notice to the person that the check, draft, or order has not been paid by the credit institution. Notice sent in the manner set forth in IC 28–2–8–1(c) constitutes notice to the person that the check, draft, or order has not been paid by the credit institution. The payee or holder of a check, draft, or order that has been dishonored incurs no civil or criminal liability for sending notice under this subsection.

Henderson argues that Sneath did not notify him using the mailing system as required by I.C. § 35–43–5–5(e) and thus, his convictions for check deception cannot stand. Sneath admits that he never mailed written notice to Henderson stating that the checks had not been paid. However, in *Kimberling v. State* (1988), Ind., 520 N.E.2d 442, 444, our supreme court held that the statute does not set up a technical and exclusive method of notification.[3] The mailing system is not the only method by which a maker could receive notice of his default. *Id.*

Here, Sneath testified that every time the bank refused to pay one of the checks he tried to contact Henderson at the office and at home to apprise him of the nonpayments. R. at 554. However, each time Sneath attempted to notify Henderson he was told that Henderson was either out of town, in a meeting, or otherwise unavailable. R. at 518, 553. Because he could not reach Henderson directly, Sneath notified Henderson's wife and the company's accountant of each of the

---

3. In support of his argument, Henderson relies heavily on *Suits v. State* (1983), Ind.App., 451 N.E.2d 375. We note that the Court of Appeal's discussion of the notification issue in *Suits* was disagreed with in *Kimberling*.

defaults. Further, Sneath testified that virtually all of his business dealings from December, 6, 1988, to July 8, 1989, were with personnel from Henderson's businesses rather than with Henderson himself. Thus, it was reasonable for Sneath to give notice to Henderson's agents and assume that they would in turn notify Henderson. We find that the evidence was sufficient to prove that Sneath gave Henderson adequate notice of the nonpayment of the checks.

Judgment affirmed.

BARTEAU and DARDEN, JJ. concur.